Patrick J. Ascione (USB #6469)
Malisa Whiting (USB #13108)
**ASCIONE & ASSOCIATES, LLC**
4692 North 300 West, Suite 220
Provo, Utah 84604
Telephone: (801) 854-1200
Fax: (801) 854-1201
Email: pascione@ana-law.com
          mwhiting@ana-law.com
*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SHAD MORRIS, Trustee of the ELOISE J. BURTON REVOCABLE TRUST, <br><br> **Plaintiff,** <br><br> vs. <br><br> Knox Capital Group, Inc., a Utah corporation; Geneos Wealth Management, Inc., a Colorado corporation; Geneos Wealth Advisors, LLC, a Colorado limited liability company; Ryan Day, an individual; Brodie Barnes, an individual; and John Doe, an individual; <br><br> **Defendants.** | **SECOND AMENDED COMPLAINT** <br><br><br><br> Case No. 2:10-CV-01209-DB <br><br> Judge Dee Benson |

<u>JURISDICTION, VENUE, & PARTIES COMMON TO ALL COUNTS</u>

1.     This Court has subject matter and personal jurisdiction over each of the parties

and real property named and identified herein. Jurisdiction in this Court is further proper

pursuant to 28 USC §1331, Section 20(a) of the Securities Act of 1933 ("Securities Act"), 15

U.S.C. § 77v(a), and section 27of the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. § 78aa.

2.      Venue is proper pursuant to U.C.A. 1953 § 78B-3-301, *et seq.* Venue is further proper in this Court pursuant to 28 U.S.C. § 1391, Section 20(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

3.      The plaintiff Shad Morris, Trustee of the Eloise J. Burton Revocable Trust ("Morris" or "Plaintiff"), is a resident of Washington County, Utah.

4.      The defendant Knox Capital Group, Inc. ("Knox") is a Utah corporation and may be served with process by serving its registered agent Brodie Barnes at 13961 South Minuteman Drive, Suite 300, Draper, Utah 84020 or by serving an officer or manager of Knox at this same address.

5.      The defendant Geneos Wealth Management, Inc. is a Colorado corporation and a registered broker-dealer in Utah, and may be served with process by serving its registered agent Russell R. Diachok at 9055 E. Mineral Circle, Suite 200, Centennial, Colorado 80112 or by serving an officer or manager at this same address.

6.      The defendant Geneos Wealth Advisors, LLC is a Colorado limited liability company and may be served with process by serving its registered agent Geneos Wealth Advisors, LLC at 9055 East Mineral Circle, Suite 200, Centennial, Colorado 80112 or by serving an officer or manager at this same address.

7.      On information and belief, Geneos Wealth Management, Inc. and Geneos Wealth Advisors, LLC are owned and operated by the same individuals, have the same employees, use the same office space, and are alter egos of one another. For this purpose, any statement alleged against one is alleged against the other, and they will collectively be referred to as "Geneos."

8.      The defendant Ryan Day ("Day") is a resident of Utah County, Utah and may be served with process by serving him with any lawful personal service, by serving him at his place

of work at 13961 South Minuteman Drive, Suite 300, Draper, Utah 84020 or by serving him at his personal residence located at 694 East 1870 North, Orem, Utah 84097.

9.     The defendant Brodie Dean Barnes ("Barnes") is a resident of Utah County, Utah and may be served with process by serving him with any lawful personal service, by serving him at his place of work at 13961 South Minuteman Drive, Suite 300, Draper, Utah 84020 or by serving him at his personal residence located at 24 East Cascade Ave., Alpine, Utah 84004.

10.     The defendant John Doe is an individual that has yet to be identified but is suspected of being directly involved with the substance of this Complaint and was the registered supervisor of Ryan Day at the time of the plaintiff's investment.

THE INVESTMENT SCHEME

11.     This matter arises from fraudulent investments in unregistered securities sold by the defendants Day, Barnes, Knox, and Geneos (collectively "Defendants"). The plaintiff Shad Morris, Trustee of the Eloise J. Burton Revocable Trust ("Plaintiff" or "Investor") invested, in his capacity as Trustee, Trust funds in the fraudulent, unregistered securities on or about March 29, 2007.

12.     The defendants Day, Barnes, Knox, and Geneos violated Utah and Federal securities law by selling the DBSI 2007 Land Improvement & Development Fund ("DBSI LIDF") described below.

13.     This fraudulent investment was one of many fraudulent investments created by DBSI and sold by Day, Barnes, Knox, and Geneos.

14.     DBSI is a conglomerate of several hundred smaller companies all owned and operated by the same individuals. Many have filed for bankruptcy. These bankruptcies were consolidated and are currently pending. For purposes of this Complaint, the hundreds of DBSI

affiliated companies will be referred to as "Debtors," those not in bankruptcies will be referred to as "affiliated non-debtors," and collectively they will be referred to as "DBSI."

15.     DBSI and its brokers and sellers raised hundreds of millions of dollars by issuing securities in the form of investment contracts involving hundreds of real estate properties to thousands of investors in every state and numerous foreign countries.

16.     Prior to filing for bankruptcy on November 6, 2008 (the "Petition Date"), DBSI engaged in several different business ventures including (1) property management, (2) commercial real estate investment/development, (3) residential real estate investment/development, (4) technology company investment, and (5) certain miscellaneous business ventures. The DBSI enterprise was conducted through hundreds of different affiliated corporate entities and partnerships. DBSI largely funded its business enterprise by soliciting investments from individual investors. The majority of these investments took the form of either a tenant-in-common investment ("TIC Investment") or an investment in a bond, note, or other interest issued by a DBSI funding entity ("Note/Bond/Fund Investment").

17.     Prior to the Petition Date, DBSI acquired, developed, improved, and sold real property. Since approximately 1999, these acquisition and development projects were largely funded through the sale of Note/Bond/Fund Investments. DBSI raised Note/Bond/Fund Investment proceeds from Note/Bond/Fund Investors on an unsecured debt and/or equity investment basis through circulars or private placement memoranda issued by an entity formed by DBSI for the purpose of raising the particular funding. The advertised purpose of the DBSI funding entity was to loan or contribute investor funds to projects within the DBSI enterprise. In some instances, but not all, loans from the funding entity were required to be secured by real property owned by DBSI affiliates. In other instances, the projects in which funds were invested

were permitted to be encumbered by liens in favor of third-party lenders. Note/Bond/Fund Investors never received an interest in real property to secure their investment.

18.    DBSI, Inc. guaranteed the Note/Bond/Fund Investment obligations of certain (but not all) funding entities to Note/Bond/Fund Investors. As of the Petition Date, there were approximately 13 DBSI funding entities with aggregate Note/Bond/Fund Investment obligations in excess of approximately $435 million owed to thousands of Note/Bond/Fund Investors. The following table summarizes the outstanding Note/Bond/Fund Investments for the Debtors as of the Petition Date.

| Issuer | Type of Investment | Owed on Petition Date |
|---|---|---|
| DBSI 2001A Funding Corporation | Bonds | $4,200,000 |
| DBSI 2001B Funding Corporation | Bonds | $9,600,000 |
| DBSI 2001C Funding Corporation | Bonds | $9,300,000 |
| DBSI 2005 Secured Notes Corporation | Notes | $59,000,000 |
| DBSI 2006 Secured Notes Corporation | Notes | $80,000,000 |
| DBSI 2008 Notes Corporation | Notes | $92,000,000 |
| DBSI 2008 Development Opportunity Fund LLC | Notes | $9,250,000 |
|  | Sharing Units | $3,000,000+ |
| DBSI Guaranteed Capital Corporation | Bonds | $17,000,000 |
| DBSI 2007 Land Improvement & Development Fund LLC | Notes | $26,000,000 |
|  | Sharing Units | $35,000,000+ |
| DBSI 2006 Land Opportunity Fund LLC | Preferred Units | $16,000,000+ |
|  | Sharing Units | $8,600,000+ |
| DBSI Real Estate Funding Corporation | Bonds | $43,500,000 |
| DBSI Short-Term Development Fund LLC | Preferred Units | $12,975,000+ |
|  | Non-Preferred Units | $7,000,000+ |
|  | Total: | $432,425,000+ |

19.    The foregoing table illustrates that, although most of the Note/Bond/Fund Investments were structured as either a Note or Bond investment, four of the Note/Bond/Fund Investment funding entities—DBSI Short-Term Development Fund LLC, DBSI 2006 Land

Opportunity Fund LLC, DBSI LIDF, and DBSI 2008 Development Opportunity Funds LLC—
sold more than one type of investment:

> a.  DBSI LIDF sold Notes and Sharing Units. The offering materials from DBSI
>     LIDF provided for a priority system of payments to investors where (i) Note
>     investors would receive interest payments and return of principal, and (ii) then
>     Sharing Unit investors would receive fixed percentage returns, a return of
>     investment, and a share in profits.

20.     DBSI LIDF offered $24,000,000 aggregate principal amount of 12%
Development Notes due December 31, 2011 ("Notes"). These Notes bear interest at the rate of
12% per annum. Pursuant to the Notes, 10% of the Notes are redeemable annually on a first-
come, first served basis. The obligations under the Notes are unsecured. Interested parties were
additionally offered the opportunity to purchase "Units" (i.e., membership interests), in DBSI
LIDF to raise capital for the acquisition and development of the real property. DBSI LIDF is
managed, and all Voting Units are owned by DBSI Development. As of the Petition Date, the
outstanding indebtedness on the Notes was approximately $26,000,000, and DBSI LIDF had
sold Sharing Units with a total sale value of approximately $35,000,000.

21.     Investigation and due diligence conducted during the Chapter 11 Cases have
revealed that, prior to the Petition Date, DBSI ran its affiliated businesses and entities as a
unified enterprise under common ownership and control. A small group of insiders employed
that control to raise cash from investors, commingle it, and then distribute it as needs appeared,
without regard for source or restrictions on use. DBSI used reserve monies obtained from TIC
Investors to pay operational expenses. DBSI used cash raised through Note/Bond/Fund
Investments to pay debts owed to TIC Investors. DBSI also used cash from the issuance of later

Note/Bond/Fund Investments to meet obligations owed with respect to earlier Note/Bond/Fund Investments and to purchase more properties, many of which were ultimately sold to TIC Investors to raise still more cash. Funds from TIC Investments and Note/Bond/Fund Investments were used to found start-up technology companies in which the underlying investors had no interest.

22.    The global enterprise did not generate a profit for investors and was kept afloat for many years by an ever-increasing volume of new investor money and heavily-leveraged real estate transactions. This self-feeding cycle continued until the dislocation in the real estate, credit, and other financial markets hindered the Debtors' ability to raise sufficient new capital from investors or obtain sufficient new lending from institutional lenders necessary to continue their real estate acquisition and sale operations.

23.    Despite raising over $100,000,000 in new private placement funds in 2008, DBSI's rampant liquidity problems forced it to file for relief under chapter 11 of the Bankruptcy Code in late 2008.

24.    An Examiner was appointed in the Bankruptcy Case to (a) investigate the circumstances surrounding (i) any and all of the Debtors' intercompany transactions and transfers, (ii) any and all transactions and transfers between and among the Debtors and any Non-Debtor Affiliates, and (iii) any and all transactions and transfers between and among the Debts and any insiders, officers, directors, and principals of the Debtors; and (b) otherwise perform the duties of an examiner set forth in Section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code.

25.    The Examiner issued his First Interim Report on August 3, 2009 and his Final Report on October 19, 2009, setting forth the results of his investigation into the affairs of the

Debtors. In his reports, the Examiner found, *inter alia*, that the Debtors and their Non-Debtor Affiliates were run as a unified business by a control group of senior managers with conflicts of interest; that the Debtors' financial and accounting records are largely unreliable; and that DBSI's collective funds have been so commingled that it would be virtually impossible to trace their actual sources and uses, notwithstanding representations made to investors.

26.    After the Examiner issued his reports, the Chapter 11 Trustee was appointed over the Debtors.

27.    The available evidence points to the fact that the undisclosed practice of running DBSI as a unified enterprise caused investors to believe that the individual companies being invested in would succeed based on the purported financial strength and competence of the parent company. The Chapter 11 Trustee also determined that it was impossible to truly trace and separate cash obtained from Note/Bond/ Fund Investments and cash obtained from TIC Investments, just as it is impossible to separate cash used to pay Note/Bond/ Fund Investment obligations from cash used to pay TIC Investment obligations. Moreover, a great many transfers of cash and properties between DBSI entities were either constructively or actually fraudulent or otherwise gave rise to claims between the DBSI affiliated entities.

28.    Investments in DBSI LIDF were accompanied by a review of a confidential private placement memorandum (PPM), dated January 24, 2007.

29.    As described in the PPM, only "accredited investors" were allowed to invest in DBSI LIDF notes. (*See* portions of January 24, 2007, PPM, attached as Exhibit A, pp. 2, 5–6).

30.    In a section labeled "Who May Invest," the PPM states that "*distribution* of this Memorandum is strictly limited to persons who meet the requirements and make the representations set forth below." (*See* Exhibit A, p. 5) (emphasis added).

31.     The requirements listed included that the notes "involve a very high risk, and are *suitable* only for persons of substantial financial means who have no need for liquidity in this investment." *Id.* (Emphasis added).

32.     Page 58 of the PPM (attached as Exhibit B) requires that:

   a.   The investor certify that they have received the PPM.

   b.   The broker/dealer or registered representative to certify that the investment is suitable for the investor, in compliance with NASD Rule 2810. More specifically, the representative had to certify that:

        i.   "I have reasonable grounds to believe, based upon information furnished from the investor concerning his investment objectives, other investments, financial situation and needs and any other information known by me, that investment in the Notes is suitable for such investor in light of his financial position, net worth and other suitability characteristics. I further certify that the investor has been informed of all pertinent facts relating to the liquidity and marketability of an investment in the Notes during the term of the Investment. . . .Prior to recommending purchase of the Notes, we have reasonable grounds to believe, on the basis of information supplied by the Purchaser concerning buyer's investment objectives, other investments, financial situation and standards, and other pertinent information that: (i) the Purchaser meets the standards established by the Company; (ii) the Purchaser has a net worth and income sufficient to sustain the risks inherent in the interest, including loss of the entire investment and lack of liquidity; and (iii) the Interest is otherwise a suitable investment for the Purchaser. We will maintain in our files documents disclosing the basis upon which the suitability of the Purchaser was determined."

33.     Based on the subscription agreement provided by Defendants, and which they averred was a true and correct copy to the agreement provided to Plaintiff, Defendants did not sign page 58 nor did they require Defendant to initial page 58. If this is the case, this would be in direct contravention of the subscription agreement and the substantiation of compliance, suitability, and appropriateness.

34.     Among the requirements, Sharing Units were to be sold only to prospective

Members who:

> (2)     represent in writing that they are "Accredited Investors" (as defined by
> Rule 501 of    Regulation D under the Securities Act;
> (3)     satisfy the investor suitability requirements established by the Company
> and as may be required under federal or state law.
>
> ***
>
> Each prospective Member must represent in writing that he or she meets, among
> others, **ALL** of the following requirements, that he or she:
>
> ***
> (g) Is an "*Accredited Investor*" (as defined under Rule 501 of Regulation D under
> the Securities Act).

*Id.*

35.     An "Accredited Investor" Trust was defined in the January 24, 2007 PPM as

follows:

> (5)     The prospective Member is a Trust with total assets in excess of
> $5,000,000, not formed for the specific purpose of acquiring the Sharing Units,
> the purchase of which is directed by a "sophisticated person" as defined in Rule
> 506(b)(2)(ii) of Regulation D under the Securities Act . . . .

*Id.* at 5–6.

## Sale of the DBSI LIDF Note to Plaintiff

36.     Geneos is a brokerage firm that researches and provides investment packages and

opportunities to its clients, which are investment advisors and investment advisor firms.

37.     Geneos uses other entities and individuals to sell investments on its behalf,

including the DBSI LIDF.

38.      Knox is one of Geneos's many clients. Knox sold the DBSI LIDF notes on behalf

of Geneos.

39.     Further, Day and Barnes are employees of Knox and Geneos.

40.     Barnes is one of the partners and owners of Knox and oversees the work of Knox's various employees, including Day.

41.     Barnes had control over Day, one of his employees.

42.     Barnes had control over whether the DBSI LIDF investment was presented to Plaintiff.

43.     Barnes had control over safeguards to keep inappropriate investors away from investments suitable only for "accredited investors."

44.     Barnes had requisite control to implement procedures to safeguard investors from inappropriate investments and the power to enforce these safeguards against employees such as Day.

45.     Each of the Defendants received gain from the sale of the DBSI LIDF note to Plaintiff through either a commission or other compensation.

46.     John Doe is the registered supervisor of Day and oversees all the investments Day sells to investors, including Plaintiff.

47.     On information and belief, Geneos did not obtain a full understanding nor conduct a sufficient investigation of DBSI's financial accounting or interaction with sister companies and affiliates.

48.     This belief is substantiated by the following evidence:

   a.   An SEC investigation was conducted into DBSI in June 2005.

   b.   The Confidential Private Placement Memorandum did not reference the SEC investigation.

49.     Nonetheless, Geneos recommended the DBSI LIDF investment to its investment advisors and investment advisor firms and represented that it had obtained all pertinent

information and conducted necessary research into DBSI LIDF to the extent that it understood

DBSI's operations and the validity of the investment.

50.     Plaintiff met in person with Day on or about February 14, 2007. As a result of this

meeting, Plaintiff engaged Knox as its investment advisor firm and paid Day between $5,000 and

$7,500 to be its investment advisor.

51.     All of Plaintiff's interactions with Knox were through Day, either representing

himself, or giving statements from his supervisor Barnes.

52.     Day represented that he had been advised by Barnes regarding the DBSI LIDF

investment and deferred to Barnes's representations on various occasions.

53.     Barnes made specific representations to Day concerning risk and suitability of the

notes for the Trust which Day conveyed to Plaintiff.

54.     Plaintiff informed Day that the funds in the Trust needed to be safely invested and

have a guaranteed return sufficient to pay the mortgage and other living expenses of the Trust

beneficiary, approximately $1,200.00-$1,500.00 each month.

55.     Plaintiff's principal was to remain secure at all times and under no circumstances

placed in high risk investments.

56.     Based on Plaintiff's guidelines, Day suggested Plaintiff invest in DBSI LIDF.

57.     Day represented that DBSI was a sound company with many ongoing projects.

Day further represented that the DBSI LIDF was stable and would generate income between

12% and 15% overall, and that the investment had a guaranteed 8% quarterly payout on the

principal amount invested.

58.    Day further represented that when the property that was being developed was sold, Plaintiff could expect returns of approximately 20% on the back end. Plaintiff was led to believe that the overall investment would take no more than 5 to 7 years.

59.    Based on these representations, Day recommended that Plaintiff invest.

60.    Based on the guaranteed 8% return on the principal amount invested, Day and Plaintiff determined that Plaintiff needed to only invest $180,000 of the overall Trust to have the returns necessary to cover the mortgage and living expenses of the Trust beneficiary.

61.    Plaintiff was permitted to review a PPM in connection with the investment but was not permitted to retain the PPM for his records.

62.    Instead, Day provided the PPM to Plaintiff for review but required it to be returned before Plaintiff invested in DBSI LIDF.

63.    To invest Trust funds in DBSI LIDF notes, Plaintiff as Trustee of the Eloise J. Burton Revocable Trust was required to sign a subscription agreement provided by DBSI. (Attached as Exhibit C). As part of filling out the subscription agreement, a box which reads "Trust/Trust Type* Testamentary," located on the first page of the agreement, was checked. Additionally, the contact information includes "Shad L. Morris, Trustee" and the agreement is signed "Shad Morris, Trustee."

64.    On information and belief, the subscription agreement was not attached to the PPM.

65.    The basis for this belief is that the subscription agreement attached to the January 24, 2007 PPM is different from the pagination on the subscription agreement signed by Plaintiff.

66.    The DBSI LIDF investment is classified as a broker dealer investment, requiring Plaintiff to invest in DBSI LIDF through Geneos instead of Knox.

67.     As such, to invest Trust funds in DBSI LIDF notes, Plaintiff as Trustee of the Eloise J. Burton Revocable Trust was required to sign a new account application with Geneos, which it did on March 29, 2007.  (Attached as Exhibit D). The application to Geneos read "Entity Name Eloise J Burton, Revocable Trust," and had a box reading "Trust" checked on the first page. Plaintiff signed the document as "Trustee." Although Plaintiff signed in his capacity as Trustee, certain portions of the application were filled out using Plaintiff's personal financial information instead of the financials of the Trust. For example, the portions of the application labeled Net Worth (i.e. $3,000,000), Annual Income (i.e. $250,000), Liquid Net Worth, (i.e. $500,000) and Tax Bracket (i.e. 32%) all were filled in based on questions asked about Shad Morris's *personal* income and not the financials of the Trust, which Trust was the prospective investor. (See Exhibit D).

68.     In signing the DBSI subscription agreement and the Geneos new account application agreement, Plaintiff made certain representations, including that he was the Trustee of the Eloise J. Burton Revocable Trust, and he was signing in his capacity as Trustee in order to invest Trust funds in DBSI LIDF notes. (*See* Exhibits C and D).

69.     Through these representations made by Plaintiff in his capacity as Trustee, Day knew that Plaintiff was a Trustee investing on behalf of a Trust.

70.     Through these representations made by Plaintiff in his capacity as Trustee, Barnes knew that Plaintiff was a Trustee investing on behalf of a Trust.

71.     Through these representations made by Plaintiff in his capacity as Trustee, Knox and Geneos knew that Plaintiff was a Trustee investing on behalf of a Trust.

72.     Contrary to the requirements laid out in the PPM – more specifically that a Trust must meet certain requirements to be an accredited investor to invest in DBSI LIDF notes, and

that such an investor must first certify in writing that they are an accredited investor – the Eloise J. Burton Revocable Trust did not meet the accredited investor asset requirement of $5,000,000, nor did Plaintiff in his capacity as Trustee ever certify on behalf of the Trust that the Trust was an accredited investor.

73.     Even if the Defendants thought the Net Worth listed in the Geneos application was that of the Trust, $3,000,000 is still on its face two million dollars short of the $5,000,000 minimum requirement listed on page 6 of the PPM for the Trust to qualify as an accredited investor and thus qualify to invest in DBSI LIDF notes.

74.     Despite the January 24, 2007, PPM's requirement that all investors must represent in writing that they are an accredited investor before they are permitted to invest in DBSI LIDF notes, Plaintiff in his capacity as Trustee has never represented, oral, written, or otherwise, that the Trust he signed on behalf of was an accredited investor.

75.     On March 29, 2007, in conjunction with signing the DBSI subscription agreement, Plaintiff in his capacity as Trustee provided the necessary Trust documents as well as a $180,000.00 check made payable to DBSI 2007 Land and Improvement Fund and executed the subscription agreement. (*See* Exhibit C).

76.     When Day reviewed the DBSI subscription agreement with Plaintiff, Day failed to review each "investor representation and warranties" section.

77.     Instead, Day discounted any risks noted in the DBSI subscription agreement.

78.     Day continually assured Plaintiff that the investment was safe and secure with the guaranteed 8% return each quarter.

79.     Any questions Plaintiff had throughout the process of deciding to invest in DBSI LIDF were presented to Day.

80.     Day either provided the information himself or deferred to Barnes or representations provided by Barnes regarding the investment.

81.     Plaintiff received its first 8% interest payment in October 2007 and continued to receive the quarterly payments through October 2008.

82.     As the financial problems of DBSI came to light, Day was unwilling or unable to provide Plaintiff with answers.

83.     On numerous occasions, Day represented that Geneos had determined that certain information could not be divulged or discussed with individuals that had invested in any of the DBSI entities.

84.     Prior to purchasing the DBSI LIDF note, Plaintiff was not informed that the various DBIS entities commingled funds and used funds from one project to meet the cash obligations of other projects or that the DBSI entities managed cash on a global basis.

85.     Information regarding the commingling of funds was available through the sworn testimony given by Douglas Swenson, controlling investor in DBSI and its various entities, before the Securities and Exchange Commission on June 28, 2005. Swenson stated that he considered anything he had a controlling interest in as being part of the DBSI entities.

86.     He further stated it would be very difficult to trace bond proceeds to particular assets because:

> the cash flows of the entire operation really consist partly from operation but mostly from financing and from sales of assets. So in the final analysis, in order to finance the activities of the entire group, it's really hard to trace where all the funds go to or where all the funds come from. But, with respect to these assets, as well as the financing of any particular property, the debts end up getting attached to specific assets or specific entities, but the proceeds of those debts really, in the final analysis, end up as financing for the activities of the entire group.

87.     This testimony was available to Geneos, Knox, Day, and Barnes before they began to sell the DBSI LIDF notes.

88.     No Defendant ever informed Plaintiff that any DBSI entity was the subject of an SEC inquiry.

THEORIES OF LIABILITY
**Respondeat Superior**

89.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

90.     Plaintiff has been damaged by the faulty and biased advice provided by Day.

91.     Upon information and belief Defendants Knox, Geneos, Barnes, and John Doe as Day's supervisors and employers were aware of, condoned, and profited by Day's activities, including Day's tortious representations and omissions.

92.     The basis of this belief is that Day was an employee of Knox. Knox was working under the supervision of the broker-dealer Geneos, and shared commissions with Geneos. Persons in supervisory positions such as Barnes, Knox, and Geneos are generally aware of and in control of lower echelon employees such as Day.

93.     Therefore, Defendants Knox, Geneos, Barnes, and John Doe are each liable and responsible for Day's activities, including any tortious conduct committed by Day.

94.     Defendants Knox, Geneos, Barnes, and John Doe were aware no, or insufficient, due diligence had been conducted regarding the DBSI LIDF investment.

95.     Defendants Knox, Geneos, Barnes, and John Doe permitted representations to be made regarding the validity of the investment.

96.     In his interactions with Plaintiff, Day was acting within the scope and time of his employment with Knox and Geneos.

97.     In giving investment advice, Day was working in furtherance of his employment or engaged in activities of the same general nature as he was authorized by his principal(s).

98.     Defendants Knox, Geneos, Barnes, and John Doe endorsed the representations that were made and were the instigators of the faulty information represented.

99.     Defendants Knox, Geneos, Barnes, and John Doe derived a benefit from Plaintiff's investment.

## Estoppel

100.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

101.     Defendants Knox, Geneos, and Barnes provided the information to Day regarding the DBSI LIDF investment opportunity.

102.     Defendants Knox, Geneos, and Barnes were aware Day was sharing the representations with potential investors.

103.     Defendants Knox, Geneos, and Barnes benefited from Plaintiff's investment in DBSI LIDF.

104.     As a result, Defendants Knox, Geneos, and Barnes are estopped from denying the existence of an agency relationship with Day.

### FEDERAL SECURITIES VIOLATIONS AGAINST DEFENDANTS
**Count I Private Cause of Action Under 15 U.S.C § 78j and 17 C.F.R. § 240.10b-5 for both Primary and Secondary Liability.**

**(Primary liability)**

105.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

106.     Defendants Knox, Geneos, Barnes, and Day engaged in the unlawful sale of unregistered securities in violation of the Exchange Act.

107.    A security, among other things, is defined as any note, bond, certificate of interest or participation in any profit sharing agreement, and investment contract. *See* 15 U.S.C. § 77a(2)(a)(1) and 15 U.S.C. § 78a(3)(a)(10).

108.    The investment offered and sold to Plaintiff by the Defendants constitutes a "security" as this term is defined and applied under the Exchange Act.

109.    Under the Exchange Act, it is unlawful for a party, in connection with the purchase or sale of a registered or unregistered security, to use any manipulative or deceptive device in connection with the sale of a security. 15 U.S.C. § 78j. Under SEC rule 10b-5, it is a violation for any party in connection with the purchase or sale of any security using interstate commerce or the mails from (1) employing any device, scheme, or artifice to defraud; (2) making any untrue statement of material fact or omitting a statement of material fact necessary to make the statement not misleading; (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5.

110.    In the Tenth Circuit, to state a claim under 15 U.S.C. § 78j and Rule 10b-5, "a plaintiff must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." *Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (citations omitted).

111.    In the Tenth Circuit, "'[r]ecklessness is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (citations omitted).

112.     Geneos, Barnes, Day, and Knox each individually violated the Exchange Act by employing fraudulent and deceptive devises, offering fraudulent misrepresentations, offering material misstatements of fact and omitting material facts in association with the offer and sale of securities using means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly.

113.     The Defendants' use of fraudulent or deceptive devices, fraudulent misrepresentations, and material misstatements of fact in violation of the Exchange Act included, but are not limited to, the following:

   a.  If page 58 (*see* Exhibit B) of the PPM was shown to Plaintiff as part of the DBSI subscription agreement on March 29, 2007 (*see* Exhibit C), and was initialed by Plaintiff and signed by Defendants, then Defendants, through signing the substantiation of compliance, suitability, and appropriateness clause on the bottom of page 58, represented to Plaintiff that:

      i.  "I have reasonable grounds to believe, based upon information furnished from the investor concerning his investment objectives, other investments, financial situation and needs and any other information known by me, that investment in the Notes is suitable for such investor in light of his financial position, net worth and other suitability characteristics. I further certify that the investor has been informed of all pertinent facts relating to the liquidity and marketability of an investment in the Notes during the term of the Investment. . . .Prior to recommending purchase of the Notes, we have reasonable grounds to believe, on the basis of information supplied by the Purchaser concerning buyer's investment objectives, other investments, financial situation and standards, and other pertinent information that: (i) the Purchaser meets the standards established by the Company; (ii) the Purchaser has a net worth and income sufficient to sustain the risks inherent in the interest, including loss of the entire investment and lack of liquidity; and (iii) the Interest is otherwise a suitable investment for the Purchaser. We will maintain in our files documents disclosing the basis upon which the suitability of the Purchaser was determined." These representations, if made, were false.

b.  The first relevant representation possibly made by Defendants, as described under ¶ 113(a), is that based on the investment objectives, financial situation, and needs of the Trust, and any other information known to Defendants, as explained to Defendants by Plaintiff, an investment in DBSI LIDF notes was suitable for the Trust, and that the Defendants reasonably believed as such. This representation, if made, was false because Plaintiff fully informed Defendants regarding the Trust's investment objectives, financial situation, and needs (i.e. safety, security, and a specific guaranteed return on investment), and, as evidenced by the risk information for DBSI LIDF notes that contradicts such representations, these objectives and needs could not be met by an investment in DBSI LIDF notes, and Defendant's knew as much.

c.  The second relevant representation possibly made by Defendants, as described under ¶ 113(a), is that the Trust met the standards established in the PPM and the Form D that DBSI filed with the U.S. Securities and Exchange Commission regarding DBSI LIDF notes for an investment in the notes, and that the Defendants reasonably believed such. This representation, if made, was false because the standards set forth in the PPM and the Form D that DBSI filed with the U.S. Securities and Exchange Commission required that only "accredited investors" could invest in DBSI LIDF notes. (*See* Exhibit A, pp. 1–3; U.S. SEC Form D, attached as Exhibit E, p. 4). Pursuant to the standards set forth in the PPM, a trust investor is accredited only if it has assets of over $5,000,000. (*See* Exhibit A, p. 3). At the time of the investment, the Trust represented by Plaintiff had assets of only approximately $550,000, less than 15% of the stated

"accredited investor" requirement. Defendants had no reasonable basis to believe

that the Trust was accredited because Plaintiff never told Defendants nor certified

that the Trust had assets of over $5,000,000.

d.  In two or three telephone conversations between February 2007 and April 2007,

Day represented to Plaintiff that the quarterly 8% returns on the investment were

guaranteed, despite what was stated in any disclosure information. This

representation was deceptive as risk information for the investment was

contradictory;

e.  In two or three telephone conversations between February 2007 and April 2007,

Day represented that DBSI was a good company with a long standing history of

solid investments. This representation was false, as the company operated at a loss

for several years before Plaintiff's investment;

f.  In two or three telephone conversations between February 2007 and April 2007,

Day represented that Plaintiff's purposes for investing— meeting mortgage and

living expenses for the Trust beneficiary— would be fulfilled. This representation

is contradicted by the risk information for the investment;

g.  The promotional material cited by Day in promoting its investments professed

that "no investor had ever lost money." This statement was illusory and reflects

that newly-raised investor funds were being used to pay off investors;

h.  In DBSI's financial statements, many, if not all, of the assets were reported at

inflated values and did not accurately reflect the liabilities of the company.

Further, many of the loan receivable amounts were concealed through their

conversion into equity and did not accurately reflect the likelihood of being

collected;

    i.    Barnes, Knox, Day and Geneos each individually knew that the Trust Plaintiff

represented in the investment transaction could not qualify as an accredited

investor as required by the PPM and each represented to Plaintiff that DBSI LIDF

notes were an appropriate and safe investment for the Trust.

114.    The Defendants' material omissions in contravention to the  Exchange Act

include, but are not limited to, the following:

    a.    If Defendants did not sign page 58 of the PPM and make the representations

under ¶ 113(a)–(c), then upon information and belief, Defendants: 1) failed to

show page 58 of the PPM to Plaintiff, 2) failed to inform Plaintiff that page 58

existed and must be initialed and signed to invest in DBSI LIDF notes, 3) failed to

have Plaintiff initial several representations on page 58 of the PPM, and 4) failed

to sign the substantiation of compliance, suitability, and appropriateness clause at

the bottom of page 58 that required the broker-dealer or representative to: (i)

substantiate compliance with state and federal law and NASD 2810, and to certify

that (ii) the Trust met the requirements of an investment in DBSI LIDF notes (i.e.

was an "accredited investor" with assets of over $5,000,000), and (iii) that an

investment in DBSI LIDF notes was suitable for the Trust based on the Trust's

investment objectives, financial situation, and needs (i.e. safety, security, and a

specific guaranteed return on investment), and any other information known to

Defendants.

b.  These beliefs are based on the fact that page 58 of the PPM, which is a page of the DBSI subscription agreement provided by Defendants as part of the PPM, which PPM they averred was a true and correct copy of the agreement provided to Plaintiff at the time of entering the investment, was blank and did not contain any initialed representations by the Plaintiff nor any signatures by the Defendants. (*See* Exhibit B). If this is the case, this would be in direct contravention of the subscription agreement and the substantiation of compliance, suitability, and appropriateness. To date, Plaintiff does not recall seeing or initialing page 58 and Plaintiff has not received an initialed and signed copy of page 58 from any party.

c.  Day failed to inform Plaintiff that none of the Defendants had conducted a thorough investigation of DBSI LIDF;

d.  Barnes failed to inform Plaintiff that he had not conducted a thorough investigation of DBSI LIDF.

e.  Knox and Geneos also failed to inform Plaintiff that they had not conducted a thorough investigation of DBSI LIDF

f.  Barnes, Knox, Day, and Geneos each individually failed to inform Plaintiff that they had not scrutinized the accounting of DBSI LIDF;

g.  Barnes, Knox, Day, and Geneos each individually failed to disclose to Plaintiff that an investigation of DBSI was conducted by the SEC;

h.  Barnes, Knox, Day, and Geneos each individually failed to inform Plaintiff that they had not researched the nature of the SEC investigation;

i.  Barnes, Knox, Day, and Geneos each individually failed to disclose that the due diligence performed was limited to accepting information provided from DBSI at face value;

j.  Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI and its controlled entities were run as a unified business without regard for the separate identities of the companies within DBSI;

k.  Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI commingled funds from its various investments;

l.  Barnes, Knox, Day, and Geneos each individually failed to disclose that funds raised by DBSI were not used in accordance with the representations in the various PPMs;

m.  Barnes, Knox, Day, and Geneos each individually failed to disclose that  based on DBSI's past practices there existed a significant risk that Plaintiff's funds would not be used in accordance with representations made in the various PPMs;

n.  Barnes, Knox, Day, and Geneos each individually failed to disclose that highly questionable internal valuations and appraisals were used to support loans from the bond, note, and fund programs sponsored by DBSI;

o.  Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI used the funds raised for one investment to meet the cash demands of previous investments;

p.  Barnes, Knox, Day, and Geneos each individually failed to disclose that there existed a significant risk that Plaintiff's investment in DBSI LIDF would in fact be used to fund other DBSI funds and projects;

q.   Barnes, Knox, Day, and Geneos each individually failed to disclose that the DBSI
     Group businesses were in continuous need of new investor funds to fund pre-
     existing obligations since at least as early as 2005;

r.   Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI
     consistently operated at a loss except for certain time periods when sales to TIC
     investors created booked profits;

s.   Barnes, Knox, Day, and Geneos each individually failed to disclose that, at times,
     DBSI loans were made from investor funds that were not backed by adequate
     security;

t.   Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI
     debt was reallocated through after-the-fact bookkeeping entries in an effort to
     make it appear that loans were adequately secured;

u.   Barnes, Knox, Day, and Geneos each individually failed to disclose that inflated
     values were arbitrarily assigned to assets "securing" DBSI loans;

v.   Barnes, Knox, Day, and Geneos each individually failed to disclose that DBSI
     engaged in year-end cash manipulations, which made it appear that certain entities
     were well capitalized when, in fact, they were not; and

w.   That Barnes, Knox, Day, and Geneos each individually failed to disclose the
     percentage of the investment that would go towards paying commissions and
     finder's fees.

x.   Barnes, Knox, Day and Geneos each individually knew that the Trust Plaintiff
     represented in the investment transaction could not qualify as an accredited
     investor as required by the PPM and failed to disclose this fact to Plaintiff.

115.    Each of the foregoing misstatements and omissions were made in connection with the sale of a security because each statement and omission was made while Defendants were soliciting the DBSI LIDF notes investment, a security under the Exchange Act, to Plaintiff.

116.    Each of the foregoing misstatements and omissions constitute material facts because a reasonable buyer of securities would find important: 1) that all necessary documentation regarding the investment, such as page 58 of the PPM, is shown to the investor and is properly initialed by the investor and signed by the broker-dealer or other representative, especially when such signature by the broker-dealer or other representative substantiates compliance with state and federal securities laws and NASD 2810 and certifies that the investment was suitable and appropriate for the investor based on all the information that the broker-dealer or other representative had received from the investor, 2) that their investment advisor and broker-dealer is properly informed on the risks of any investments they recommend and that their advisor and broker-dealer properly inform them of all of the risks of the investment instead of glossing over such risks, 3) that their investment advisor and broker-dealer is aware and properly informs them of any SEC investigations into entities involved in the investment and the practice of that entity of comingling funds and using new investor money to pay previous investors, and 4) that their investment advisor and broker-dealer helps them enter only investments that are appropriate, suitable, safe, secure, and return a guaranteed return on investment if such is requested, and only properly certify as such.

117.    Plaintiff relied on these misstatements and omissions in making the decision to invest in DBSI LIDF notes. Plaintiff's main concerns for the Trust investment was that it would be appropriate, suitable, safe, secure, and return a guaranteed return on investment. Each misstatement and omission above misled Plaintiff into believing that the investment was

appropriate, suitable, safe, secure, and would return a guaranteed return on investment, and because of that falsely created belief, Plaintiff decided to invest in DBSI LIDF notes. Had Plaintiff been aware of the foregoing misstatements and omissions, particularly if he had been aware of the SEC complaint and comingling of funds or the fact that the Trust did not meet the investor requirements under the PPM, he would not have invested in the DBSI LIDF notes.

118.    These misstatements and omissions were the direct cause of Plaintiff's loss. This is because:

      a.  Had Plaintiff been properly informed as to the risks, unsuitability, and inappropriateness of the investment for the Trust, he never would have invested in the DBSI LIDF notes, and thus no Trust funds would have been lost.

      b.  The subject matter of these misrepresentations touch on the reasons for the investment's decline in value. The direct cause of the failure of the DBSI LIDF notes was not because the investment as described in the PPM failed during a market downturn, but rather that DBSI LIDF notes were not a safe and secure investment, as represented by Defendants, because of its year-over-year losses, and its practice of comingling funds to pay outstanding debts owed by DBSI as a scheme similar to a ponzi scheme.

119.    The exercise of reasonable care by Barnes, Knox, Day, or Geneos should have easily revealed warning signs of the fraudulent investment. On information and belief, Barnes, Knox, Day, and Geneos relied on the information provided by DBSI regarding the investment and based on the commission received from selling the investment chose not to further investigate the investment.

120.    The basis for the belief that Barnes, Knox, Day, and Geneos relied on the information provided by DBSI regarding the investment is that no other information was provided to Plaintiff other than that which DBSI themselves prepared.

121.    The basis for the belief that the decision not to investigate further was based on the commission received from selling the investment is that the Trust Plaintiff represents had only $550,000 in assets and therefore did not meet the investor requirements plainly set forth in the PPM. Nonetheless, seeking the commission payments, Defendants recommended the investment.

122.    Based on the foregoing facts, Defendants Barnes, Knox, Day, and Geneos's conduct as described above presented a danger of misleading Plaintiff that DBSI was appropriate, suitable, secure, and safe investment, and would return a guaranteed return on investment. In reality, Defendants were either aware of the dangerous deficiencies in DBSI's practices and the inability of Plaintiff's Trust to qualify to invest in DBSI LIDF and willfully mislead Plaintiff into believing that DBSI LIDF would be an appropriate, suitable, secure, and safe investment, and would return a guaranteed return on investment, or the danger of misleading the Plaintiff with the misrepresentations and omissions indicated above was so obvious that it must have been known to Defendants.

123.    As a result of Defendants conduct, Plaintiff has suffered damages in an amount no less than its principal investment of $180,000.00 plus interest at 12% per annum, plus all legal fees incurred through this lawsuit.


SUITABILITY

124.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

125.     Day, Barnes, Knox, and Geneos had an obligation to recommend the purchase of securities for which he had a reasonable basis for believing the recommendation was suitable for Plaintiff under NASD rule 2310(a).

126.     Day, Barnes, Knox, and Geneos were also under an obligation to make reasonable efforts to obtain the Trust's financial status, tax status, investment objectives, and other objectively important information from the Trust under NASD rule 2310(b).

127.     Also, if page 58 (*see* Exhibit B) of the PPM was shown to Plaintiff as part of the DBSI subscription agreement on March 29, 2007 (*see* Exhibit C), and was initialed by Plaintiff and signed by Defendants, then Defendants made certain representations of suitability and appropriateness.

128.     The first relevant representation possibly made by Defendants, as described under ¶ 113(a), is that based on the investment objectives, financial situation, and needs of the Trust, and any other information known to Defendants, as explained to Defendants by Plaintiff, an investment in DBSI LIDF notes was suitable for the Trust, and that the Defendants reasonably believed as such. This representation, if made, was false because Plaintiff fully informed Defendants regarding the Trust's investment objectives, financial situation, and needs (i.e. safety, security, and a specific guaranteed return on investment), and, as evidenced by the risk information for DBSI LIDF notes that contradicts such representations, these objectives and needs could not be met by an investment in DBSI LIDF notes, and Defendant's knew as much.

129.     The second relevant representation possibly made by Defendants, as described under ¶ 113(a), is that the Trust met the standards established in the PPM and the Form D that

DBSI filed with the U.S. Securities and Exchange Commission regarding DBSI LIDF notes for an investment in the notes, and that the Defendants reasonably believed such. This representation, if made, was false because the standards set forth in the PPM and the Form D that DBSI filed with the U.S. Securities and Exchange Commission required that only "accredited investors" could invest in DBSI LIDF notes. (See Exhibit A, pp. 1–3; U.S. SEC Form D, attached as Exhibit E, p. 4). Pursuant to the standards set forth in the PPM, a trust investor is accredited only if it has assets of over $5,000,000. (See Exhibit A, p. 3). At the time of the investment, the Trust represented by Plaintiff had assets of only approximately $550,000, less than 15% of the stated "accredited investor" requirement. Defendants had no reasonable basis to believe that the Trust was accredited because Plaintiff never told Defendants nor certified that the Trust had assets of over $5,000,000.

130.    In the alternative, if Defendants did not sign page 58 of the PPM and make the representations under ¶ 113(a)–(c), ¶ 127–129, then upon information and belief, Defendants: 1) failed to show page 58 of the PPM to Plaintiff, 2) failed to inform Plaintiff that page 58 existed and must be initialed and signed to invest in DBSI LIDF notes, 3) failed to have Plaintiff initial several representations on page 58 of the PPM, and 4) failed to sign the substantiation of compliance, suitability, and appropriateness clause at the bottom of page 58 that required the broker-dealer or representative to: (i) substantiate compliance with state and federal law and NASD 2810, and to certify that (ii) the Trust met the requirements of an investment in DBSI LIDF notes (i.e. was an "accredited investor" with assets of over $5,000,000), and (iii) that an investment in DBSI LIDF notes was suitable for the Trust based on the Trust's investment objectives, financial situation, and needs (i.e. safety, security, and a specific guaranteed return on investment), and any other information known to Defendants.

131.    These beliefs are based on the fact that page 58 of the PPM, which is a page of the DBSI subscription agreement provided by Defendants as part of the PPM, which PPM they averred was a true and correct copy of the agreement provided to Plaintiff at the time of entering the investment, was blank and did not contain any initialed representations by the Plaintiff nor any signatures by the Defendants. (*See* Exhibit B). If this is the case, this would be in direct contravention of the subscription agreement and the substantiation of compliance, suitability, and appropriateness. To date, Plaintiff does not recall seeing or initialing page 58 and Plaintiff has not received an initialed and signed copy of page 58 from any party.

132.    Thus, upon information and belief, if Defendants did not sign page 58 of the PPM and make the representations under ¶ 113(a)–(c), ¶ 127–129, they failed to do so because they knew that the investment was not suitable nor appropriate for the Trust, and did not want to sign because they wanted to try and avoid liability if the Trust investment failed.

133.    Also, in his meetings with Day regarding safe and appropriate investments for the Trust, Plaintiff fully informed Day, and Barnes, Knox, and Geneos through Day, that Plaintiff sought a safe investment with a guaranteed regular return sufficient to cover the mortgage and living expenses of the Trust income beneficiary.

134.    The investment provided to Plaintiff by Defendants was not suitable to Plaintiff's stated goals for the Trust. As indicated by the facts above, DBSI LIDF notes were instead fraught with risk. Contrary to Defendant's representations and omissions to Plaintiff, DBSI LIDF notes 1) did not have the guaranteed regular return that he sought for the Trust, 2) were unsafe as is evidenced by DBSI's consistent year-over-year losses, need to use new investor funds to pay previous investors, and to use new investor funds and comingle funds to stay in business, and 3)

were not an appropriate investment for the Trust Plaintiff represented because the Trust was not an accredited investor as required by the PPM.

135.     Defendants were either aware the assets of the Trust were below the $5,000,000 amount required to invest in DBSI LDIF and nevertheless proceeded to invest in the notes, or acted acted recklessly by investing in the DBSI LIDF notes, which have a $5,000,000 minimum asset requirement, without ascertaining the assets of the Trust.

136.     As a result of Defendant's incompatible investment scheme, Plaintiff has suffered damages in an amount no less than its principal investment of $180,000.00 plus interest at 12% per annum, plus all legal fees incurred through this lawsuit.

### (Secondary Liability as to Barnes, Geneos, and Knox under 15 U.S.C. § 78t(a))

137.     Barnes, Geneos, and Knox are considered "Controlling Persons" under the Exchange Act.

138.     Under the Exchange Act, a control person, i.e. a person who controls any person liable under Chapter 2B or any regulation promulgated thereunder, is jointly and severally liable to a plaintiff for the unlawful acts of a seller under its control that violates securities regulations.

139.     By reason of the forgoing, Geneos, Knox, Barnes, and Day violated provisions of federal securities statutes as outlined above concerning the unlawful sale of unregistered securities using interstate commerce and have harmed Plaintiff in the amount of its principal investment of $180,000.00 plus interest at 12% per annum.

140.     Plaintiff has plead facts which reasonably show a connection of direct or indirect control over Day by Geneos, Knox, and Barnes, taken from the pleadings as follows:

    a.     "Geneos uses other entities and individuals to sell investments on its behalf, including the DBSI LIDF." ¶ 37.

b.   "Geneos recommended the DBSI LIDF investment to its investment advisors and investment advisor firms and represented that it had obtained all pertinent information and conducted necessary research into DBSI LIDF to the extent that it understood DBSI's operations and the validity of the investment." ¶49.

c.   "Knox is one of Geneos's many clients. Knox sold the DBSI LIDF notes on behalf of Geneos." ¶ 38.

d.   "Day and Barnes are employees of Knox and Geneos." ¶ 39.

e.   "Barnes is one of the partners and owners of Knox and oversees the work of Knox's various employees, including Day." ¶ 40.

f.   "Barnes had control over whether the DBSI LIFD investment was presented to Plaintiff." ¶ 42.

g.   "Barnes had control over safeguards to keep inappropriate investors away from investments suitable only for 'accredited investors.'" ¶ 43.

h.   "Barnes had requisite control to implement procedures to safeguard investors from inappropriate investments and the power to enforce these safeguards against employees such as Day." ¶ 44.

i.   "John Doe is the registered supervisor of Day and oversees all the investments Day sells to investors, including Plaintiff." ¶ 46.

j.   "All of Plaintiff's interactions with Knox were through Day, either representing himself, or giving statements from his supervisor Barnes." ¶ 51.

k.   "Day represented that he had been advised by Barnes regarding the DBSI LIDF investment and deferred to Barnes's representations on various occasions." ¶ 52.

l.   "Barnes made specific representations to Day concerning risk and suitability of
the notes for the Trust which Day conveyed to Plaintiff." ¶ 53.

m.   "Any questions Plaintiff had throughout the process of deciding to invest in DBSI
LIDF were presented to Day. Day either provided the information himself or
deferred to Barnes or representations provided by Barnes regarding the
investment." ¶ 80–81.

n.   "The DBSI LIDF investment is classified as a broker dealer investment, requiring
Plaintiff to invest in DBSI LIDF through Geneos instead of Knox." ¶ 66.

o.   "As such, to investment Trust funds in DBSI LIFD notes, Plaintiff as Trustee of
the ELOISE J. Burton Revocable Trust was required to sign a new account
application with Geneos, which it did on March 39, 2007." ¶ 67.

p.   "Defendants Knox, Geneos, Barnes, and John Doe were aware no, or insufficient,
due diligence had been conducted regarding the DBSI LIDF investment." ¶ 94.

q.   "Defendants Knox, Geneos, Barnes, and John Doe permitted representations to be
made regarding the validity of the investment." ¶ 95.

r.   "In his interactions with Plaintiff, Day was acting within the scope and time of his
employment with Knox and Geneos." ¶ 96.

s.   "In giving investment advice, Day was working in furtherance of his employment
or engaged in activities of the same general nature as he was authorized by his
principal(s)." ¶ 97.

t.   "Defendants Knox, Geneos, Barnes and John Doe endorsed the representations
that were made and were the instigators of the faulty information represented." ¶
98.

u.   "Defendants Knox, Geneos, Barnes, and John Doe derived a benefit from Plaintiff's investment," ¶ 99, namely that "[e]ach of the Defendants received gain from the sale of the DBSI LIFD note to Plaintiff through either a commission or other compensation." ¶ 45.

v.   "Defendants Knox, Geneos, and Barnes provided the information to Day regarding the DBSI LIF investment opportunity." ¶ 101.

w.   "Defendants Knox, Geneos, and Barnes were aware Day was sharing the representations with potential investors." ¶ 102.

141.   Thus, Geneos, Knox, and Barnes, because of their control person status over Day, who has violated provisions of the federal securities statutes as outlined above, are jointly and severally liable to Plaintiff for the unlawful acts of the controlled person.

UTAH SECURITIES VIOLATIONS AGAINST DEFENDANTS
**Count II Private Cause of Action for Primary and Secondary Liability under Utah Code Ann. § 61-1-22 for Violation of Utah Code Ann. §§ 61-1-1.**

**(Primary Liability)**

142.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

143.   The Defendants engaged in the unlawful, sale of unregistered securities in violation of the Utah Uniform Securities Act ("UUSA").

144.   The Defendants offered to sell to Plaintiff an investment contract interest by offering an investment interest in the DBSI LIDF.

145.   The Defendants were sellers under § 61-1-1 because each received compensation in connection with the sale of the DBSI notes to Plaintiff, and each pursued selling the note for their own pecuniary interest.

146.   Plaintiff bought the DBSI LIDF securities from and through Defendants.

147.     Under the UUSA, it is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to (1) employ any device, scheme, or artifice to defraud; (2) make any untrue statement of material fact or omit a statement of material fact necessary to make the statement not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. Utah Code Ann. § 61-1-1.

148.     Further, under the UUSA, it is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, to employ any devices, scheme, or artifice to defraud the other person or engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person. Utah Code Ann. § 61-1-2.

149.     Under Utah law, to have a private right of action against Defendants for a violation of § 61-1-2, the following are required: 1) "defendants, in connection with the offer or sale of a security, either made an untrue statement of a material fact or omitted to state a material fact," 2) "plaintiffs did not know of the untruth or omission," and 3) "defendants knew or in the exercise of reasonable care could have learned of the untruth or omission." *Gohler v. Wood*, 919 P.2d 561 (1996) (citations and internal quotations omitted). Also, a person violates 61-1-1(2), regarding material misstatements and omissions, "only if that person acts 'willfully.'" *Fibro Trust, Inc. v. Brahman Financial, Inc.*, 974 P.2d 288 (1999) (citation omitted). "Wilfully" does not require scienter, but instead "[a] person engages in conduct . . . willfully . . . when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* (citation omitted).

150.    The UUSA contains no requirement of scienter and the Utah Supreme Court has specifically held that none exists. *See State v. Larsen*, 865 P.2d 1355, 1360 (Utah 1993) (Holding that "[i]f the legislature had wanted scienter for perceived public policy reasons, it could have included that requirement. It did not, and we will not.").

151.    Defendants only need to make one material misstatement or omission to be found liable under the UUSA.  *See State v. Schwenke*, 2009 UT App 345, ¶15, 222 P.3d 768 (stating that "one statement is alone sufficient to satisfy the elements of the statute") *cert. denied*, 230 P.3d 127 (Utah 2010).

152.    By making the statements under ¶ 113, the Defendants have violated § 61-1-1 by employing fraudulent and deceptive devices, offering fraudulent misrepresentations, offering material misstatements of fact, and making untrue statements concerning value in association with the promotion, offer, and sale of securities within Utah.

153.    By making the omissions under ¶ 114, the Defendants have further violated the UUSA by omitting to disclose material facts in association with the promotion, offer, and sale of securities within Utah.

154.    Each of the foregoing misstatements and omissions were made in connection with the sale of a security because each statement and omission was made while Defendants were soliciting the DBSI LIDF notes investment, a security under the Exchange Act, to Plaintiff.

155.    Each of the foregoing misstatements and omissions constitute material facts because a reasonable buyer of securities would find important: 1) that all necessary documentation regarding the investment, such as page 58 of the PPM, is shown to the investor and is properly initialed by the investor and signed by the broker-dealer or other representative, especially when such signature by the broker-dealer or other representative substantiates

compliance with state and federal securities laws and NASD 2810 and certifies that the investment was suitable and appropriate for the investor based on all the information that the broker-dealer or other representative had received from the investor, 2) that their investment advisor and broker-dealer is properly informed on the risks of any investments they recommend and that their advisor and broker-dealer properly inform them of all of the risks of the investment instead of glossing over such risks, 3) that their investment advisor and broker-dealer is aware and properly informs them of any SEC investigations into entities involved in the investment and the practice of that entity of comingling funds and using new investor money to pay previous investors, and 4) that their investment advisor and broker-dealer helps them enter only investments that are appropriate, suitable, safe, secure, and return a guaranteed return on investment if such is requested, and only properly certify as such.

156.    Plaintiff relied on these misstatements and omissions in making the decision to invest in DBSI LIDF notes. Plaintiff's main concerns for the Trust investment were that it would remain safe, secure, and return a guaranteed income. Each misstatement and omission above misled Plaintiff into believing that the investment was appropriate, suitable, safe, secure, and would return a guaranteed income, and because of that falsely created belief, Plaintiff decided to invest in DBSI LIDF notes. Had Plaintiff been aware of the foregoing misstatements and omissions, particularly if he had been aware of the SEC complaint and comingling of funds or the fact that the Trust did not meet the investor requirements under the PPM, he would not have invested in the DBSI LIDF notes.

157.    Defendants made these misstatements and omissions willingly. Each Defendant consciously: 1) failed to do due diligence on the safety of the DBSI LIDF notes investment and misinformed Plaintiff as to the risks of the investment, 2) failed to ascertain whether the Trust

was an accredited investor, failed to have Plaintiff certify as such, and misinformed Plaintiff that

DBSI LIDF notes were an appropriate investment for the Trust, and 3) failed to either (i) show

Plaintiff page 58 of the PPM, inform Plaintiff about such page, and sign the substantiation of

compliance and suitability clause at the bottom of page 58 and have Plaintiff initial certain

representations on the same page or (ii) signed the substantiation of compliance, suitability, and

appropriateness, falsely representing that (a) based on the investment objectives, financial

situation, and needs of the Trust, and any other information known to Defendants, as explained

to Defendants by Plaintiff, an investment in DBSI LIDF notes was suitable for the Trust, and

Defendants reasonably believed as such, despite the fact that Plaintiff fully informed Defendants

regarding the Trust's investment objectives, financial situation, and needs (i.e. safety, security,

and a specific guaranteed return on investment), and, as evidenced by the risk information for

DBSI LIDF notes that contradicts such representations, these objectives and needs could not be

met by an investment in DBSI LIDF notes, and Defendant's knew as much, and (b) that Trust

met the standards established by DBSI for an investment in DBSI LIDF notes, and the

Defendants reasonably believed such, despite the fact that the standards set forth in the PPM and

the Form D that DBSI filed with the U.S. Securities and Exchange Commission required that

only "accredited investors" could invest in DBSI LIDF notes, (*see* Exhibit A, pp. 1–3; U.S. SEC

Form D, attached as Exhibit E, p. 4), and pursuant to the standards set forth in the PPM, a trust

investor is accredited only if it has assets of over $5,000,000, (*see* Exhibit A, p. 3), and at the

time of the investment, the Trust represented by Plaintiff had assets of only approximately

$550,000, less than 15% of the stated "accredited investor" requirement; Defendants had no

reasonable basis to believe that the Trust was accredited because Plaintiff never told Defendants

nor certified that the Trust had assets of over $5,000,000.

158.    By accepting consideration for the investment resulting from their abundant false representations, omissions of material fact, and scheme to defraud Plaintiffs as discussed previously herein, the Defendants further violated the UUSA.

159.    The exercise of reasonable care by the Defendants should have easily revealed warning signs of the fraudulent investment. On information and belief, the Defendants relied on the information provided by DBSI regarding the investment and, based on the commission received from selling the investment, chose not to further investigate the investment.

160.    Based on the foregoing facts, Defendants Barnes, Knox, Day, and Geneos's conduct as described above presented a danger of misleading Plaintiff that DBSI was a safe and appropriate investment for Plaintiff. In reality, Defendants were either aware of the dangerous deficiencies in DBSI's practices and the inability of the Trust to qualify to invest in DBSI LIDF and willfully mislead Plaintiff into believing that DBSI LIDF would be an appropriate, suitable, safe, and secure investment vehicle, returning a guaranteed return on investment, or the Defendants through the use of reasonable care could have learned of the untruthfulness of their misrepresentations and omissions.

161.    As a result of Defendants conduct, Plaintiff has suffered damages in an amount no less than its principal investment of $180,000.00 plus interest at 12% per annum, plus all legal fees incurred through this lawsuit.

**(Secondary Liability Under Utah Code Ann. § 61-1-22(4)(a))**

162.    Applying the facts set forth in this complaint with the standard below indicates that the Defendants are controlling persons under the UUSA.

163.    The Defendants are jointly and severally liable for the actions of those parties that are liable for securities fraud as discussed above.

164.    Pursuant to Utah Code Ann.§ 61-1-22(4)(a), every person who directly or indirectly controls a seller who is liable of securities fraud, including every partner, officer, director, employee who materially aids in the sale, and every broker-dealer who materially aides in the sale, is jointly and severally liable with and to the same extent as the seller, "unless the nonseller who is liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

165.    Under the UUSA, a controlling person is jointly and severally liable to a plaintiff for the unlawful acts of a seller that violates securities regulations over which she has control.

166.    As set forth in the facts fully incorporated herein, Defendants are partners, officers, directors, employees, or broker-dealers who materially aided in selling the DBSI LIDF securities to Plaintiff.

167.    Plaintiff has plead facts which reasonably show a connection of direct or indirect control over Day by Geneos, Knox, and Barnes, taken from the pleadings as follows:

    a.    "Geneos uses other entities and individuals to sell investments on its behalf, including the DBSI LIDF." ¶ 37.

    b.    "Geneos recommended the DBSI LIDF investment to its investment advisors and investment advisor firms and represented that it had obtained all pertinent information and conducted necessary research into DBSI LIDF to the extent that it understood DBSI's operations and the validity of the investment." ¶49.

c.  "Knox is one of Geneos's many clients. Knox sold the DBSI LIDF notes on behalf of Geneos." ¶ 38.

d.  "Day and Barnes are employees of Knox and Geneos." ¶ 39.

e.  "Barnes is one of the partners and owners of Knox and oversees the work of Knox's various employees, including Day." ¶ 40.

f.  "Barnes had control over whether the DBSI LIFD investment was presented to Plaintiff." ¶ 42.

g.  "Barnes had control over safeguards to keep inappropriate investors away from investments suitable only for 'accredited investors.'" ¶ 43.

h.  "Barnes had requisite control to implement procedures to safeguard investors from inappropriate investments and the power to enforce these safeguards against employees such as Day." ¶ 44.

i.  "John Doe is the registered supervisor of Day and oversees all the investments Day sells to investors, including Plaintiff." ¶ 46.

j.  "All of Plaintiff's interactions with Knox were through Day, either representing himself, or giving statements from his supervisor Barnes." ¶ 51.

k.  "Day represented that he had been advised by Barnes regarding the DBSI LIDF investment and deferred to Barnes's representations on various occasions." ¶ 52.

l.  "Barnes made specific representations to Day concerning risk and suitability of the notes for the Trust which Day conveyed to Plaintiff." ¶ 53.

m.  "Any questions Plaintiff had throughout the process of deciding to invest in DBSI LIDF were presented to Day. Day either provided the information himself or

deferred to Barnes or representations provided by Barnes regarding the investment." ¶ 80–81.

n. "The DBSI LIDF investment is classified as a broker dealer investment, requiring Plaintiff to invest in DBSI LIDF through Geneos instead of Knox." ¶ 66.

o. "As such, to investment Trust funds in DBSI LIFD notes, Plaintiff as Trustee of the ELOISE J. Burton Revocable Trust was required to sign a new account application with Geneos, which it did on March 39, 2007." ¶ 67.

p. "Defendants Knox, Geneos, Barnes, and John Doe were aware no, or insufficient, due diligence had been conducted regarding the DBSI LIDF investment." ¶ 94.

q. "Defendants Knox, Geneos, Barnes, and John Doe permitted representations to be made regarding the validity of the investment." ¶ 95.

r. "In his interactions with Plaintiff, Day was acting within the scope and time of his employment with Knox and Geneos." ¶ 96.

s. "In giving investment advice, Day was working in furtherance of his employment or engaged in activities of the same general nature as he was authorized by his principal(s)." ¶ 97.

t. "Defendants Knox, Geneos, Barnes and John Doe endorsed the representations that were made and were the instigators of the faulty information represented." ¶ 98.

u. "Defendants Knox, Geneos, Barnes, and John Doe derived a benefit from Plaintiff's investment," ¶ 99, namely that "[e]ach of the Defendants received gain from the sale of the DBSI LIFD note to Plaintiff through either a commission or other compensation." ¶ 45.

v.   "Defendants Knox, Geneos, and Barnes provided the information to Day regarding the DBSI LIF investment opportunity." ¶ 101.

w.   "Defendants Knox, Geneos, and Barnes were aware Day was sharing the representations with potential investors." ¶ 102.

168.   By reason of the foregoing, Geneos, Knox, and Barnes are jointly and severally liable for the actions of those parties that are liable for securities fraud as discussed above.

169.   By reason of the foregoing, the Defendants violated Utah Code Ann. § 61-1-1 and are liable under Utah Code Ann. § 61-1-22 concerning the fraudulent sale of unregistered securities in Utah using interstate commerce and have harmed Plaintiff in the amount of its principal investment of $180,000.00 plus interest at a rate of 12% per annum.

170.   Based on the purposes of the Trust investment, of which Defendants were aware, and the complete lack of investigation which Defendants otherwise represented, the actions of Defendants were intentional or reckless in nature and justify the awarding treble damages, attorneys' fees and costs in accordance with Utah Code Ann § 61-1-22(2).

COUNT III – FRAUDULENT NON-DISCLOSURE

171.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

172.   Defendants have failed to disclose information to Plaintiff regarding the DBSI LIDF investment. More specifically, Defendants have made the omissions in ¶ 114.

173.   Each of the omissions under ¶ 114 constitute material facts because a reasonable buyer of securities would find important: 1) that all necessary documentation regarding the investment, such as page 58 of the PPM, is shown to the investor and is properly initialed by the investor and signed by the broker-dealer or other representative, especially when such signature

by the broker-dealer or other representative substantiates compliance with state and federal

securities laws and NASD 2810 and certifies that the investment was suitable and appropriate for

the investor based on all the information that the investment advisor had received from the

investor, 2) that their investment advisor and broker-dealer is properly informed on the risks of

any investments they recommend and that their advisor and broker-dealer properly inform them

of all of the risks of the investment instead of glossing over such risks, 3) that their investment

advisor and broker-dealer is aware and properly informs them of any SEC investigations into

entities involved in the investment and the practice of that entity of comingling funds and using

new investor money to pay previous investors, and 4) that their investment advisor and broker-

dealer helps them enter only investments that are appropriate, suitable, safe, secure, and return a

guaranteed return on investment if such is requested, and only properly certify as such.

174.    The non-disclosed information was known to the Defendants. Defendants were all

aware:1) that all necessary documentation regarding the investment, such as page 58 of the PPM,

was not shown to Plaintiff and was not properly initialed Plaintiff and that the Defendants did not

sign the substantiation of compliance, suitability and appropriateness, 2) that they were not

properly informed of the risks of the DBSI LIDF notes investment and had not done their due

diligence, and 3) that the investment was not suitable based on the financial objectives, financial

situation, and needs (i.e. safety, security, and a guaranteed return on investment) or appropriate

for the Trust.

175.    Because the Defendants were investment advisors, broker-dealers, and sellers of

securities, they had a duty to: 1) exercise due diligence in investigating all investments which

they sell, 2) make sure that the Trust was an accredited investor pursuant to the requirements of

the PPM and as represented in the Form D that DBSI filed with the U.S. Securities and Exchange

Commission, and 3) make sure that the investment was suitable for the expressed financial objectives, financial situation, and needs (i.e. safety, security, and a guaranteed return on investment) of the trust.

176.     The Defendants had a legal duty to disclose this information to Plaintiff as the Defendants were investment advisors, broker-dealers, and sellers of securities upon whom Plaintiff was relying for sound financial advice, and as already described, these omissions materially affected the desirability of the investment.

177.     All of the Defendants were aware, or should have been aware, that the information not disclosed would materially affect Plaintiff's investment decision and should have been disclosed because all of the omissions regarded Plaintiff's express purposes for making an investment using Trust funds and the needs (i.e. safety, security, and a guaranteed return on investment) of the Trust investment.

178.     The Defendants failed to disclose the above listed information for the specific purpose of increasing the likelihood that Plaintiff invest in DBSI LIDF.

179.     Plaintiff did, in fact, rely on the Defendants to fully disclose any information necessary to make the other representations made by the Defendants not misleading.

180.     As a direct result of the Defendants' negligence or willful misconduct, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal investment of $180,000 plus missed interest payments, with reasonable attorneys' fees and costs associated with this action.

181.     Based on the purposes of the Trust, of which Defendants were aware, and complete lack of investigation which Defendants otherwise represented, the actions of

Defendants were intentional or reckless in nature and justify awarding treble damages, attorneys'

fees and costs in accordance with U.C.A. § 61-1-22(2).

## Count IV – Breach of Fiduciary Duty

182.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this

Complaint as though fully set forth herein.

183.     Plaintiff retained Day and Knox as its investment advisor based on the

represented superior knowledge each possessed.

184.     Plaintiff entered into a special relationship of Trust, confidence, and dependence

with Defendants Day and Knox.

185.     Plaintiff fully informed Defendants Day and Knox that the principal amount

invested needed to remain secure and have a guaranteed return to provide for the mortgage and

living expenses of the beneficiary.

186.     Plaintiff depended on and put confidence in Defendants Day and Knox's superior

knowledge.

187.     Defendants provided misleading information to Plaintiff and failed to inform

Plaintiff of various aspects of the investment and company with which the investment would be

handled.

188.     Accordingly, Defendant Day and Knox have breached a fiduciary duty owed

Plaintiff.

189.     Defendant Day and Knox also breached a fiduciary duty by suggesting to Plaintiff

a wholly unsuitable and inappropriate investment for the Trust.

190.     By reason of the foregoing, Defendants Day and Knox's breach of fiduciary duty

has harmed Plaintiff in the amount of its principal investment of $180,000.00.

191.    By reason of the foregoing, Defendants Day and Knox's breach of fiduciary duty has harmed Plaintiff, further causing it to incur costs and attorneys' fees associated with this proceeding and the loss of interest.

<u>Count V – Negligence</u>
**(All Defendants)**

192.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

193.    The Defendants owed Plaintiff a duty of care concerning its investment in DBSI LIDF.

194.    This duty of care includes researching publicly and generally available information regarding the investment, reviewing the accounting provided by DBSI, researching the course of dealing between DBSI and its sister companies and affiliates, reviewing any statements made by DBSI regarding its financial position, assuring that all paperwork relevant to the investment is given to Plaintiff and is properly initialed and signed by all parties, and assuring that only accredited investors invested in DBSI LIDF notes and that any investment in DBSI LIDF notes are suitable for an investor based on the investor's financial objectives, financial situations, and needs.

195.    The Defendants failed to exercise the requisite duty of care owed Plaintiff.

196.    The Defendants' failure to exercise care proximately and actually caused Plaintiff's damages.

197.    As a result of the foregoing, the Defendants have committed negligence.

198.    As a direct result of the Defendants' negligence, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal

investment of $180,000 and missed interest payments, with reasonable attorneys' fees and costs associated with this action.

**(Ryan Day)**

199.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein

200.    Day owed Plaintiff a duty of care in presenting investments in line with the purposes of the Trust.

201.    Plaintiff explained to Day that the Trust needed to provide for the mortgage and living expenses of the beneficiary, that the principal needed to remain secure at all times, and that the return on investment needed to be guaranteed.

202.    Knowing this information, Day recommended the DBSI LIDF investment to Plaintiff.

203.    In reality, the DBSI LIDF investment was not secure and did not guarantee specific returns on the investment.

204.    Day breached his duty to Plaintiff by failing to exercise the requisite duty of care owed to Plaintiff by recommending an investment that was unsuitable for Plaintiff's needs and purposes.

205.    Plaintiff reasonably relied on Day's recommendation.

206.    Day's failure to exercise care proximately and actually caused Plaintiff's damages.

207.    As a result of the foregoing, Day has committed negligence.

208.    As a direct result of the Defendants' negligence, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes Plaintiff's principal

investment of $180,000 and missed interest payments, with reasonable attorneys' fees and costs associated with this action.

Count VI – Fraudulent Misrepresentation

209.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

210.    More specifically, Plaintiff incorporates ¶¶ 113 and 114 herein. Each constitutes a representation of fact made by Defendants regarding the DBSI LIDF investment.

211.    As already explained under ¶¶ 113 and 114, each of these representations were false.

212.    Each of these representations regarded a presently existing fact. Each fact regarded the suitability, risk, and appropriateness of investing in DBSI LIDF notes, which suitability, risk, and appropriateness was known at the time the investment was offered to the Trust Plaintiff represented and at the time the Trust invested in the notes. Thus, each representation regarded a presently existing fact.

213.    Each of the foregoing misstatements and omissions constitute material facts because a reasonable buyer of securities would find important: 1) that all necessary documentation regarding the investment, such as page 58 of the PPM, is shown to the investor and is properly initialed by the investor and signed by the broker-dealer or other representative, especially when such signature by the broker-dealer or other representative substantiates compliance with state and federal securities laws and NASD 2810 and certifies that the investment was suitable and appropriate for the investor based on all the information that the broker-dealer or other representative had received from the investor, 2) that their investment advisor and broker-dealer is properly informed on the risks of any investments they recommend

and that their advisor and broker-dealer properly inform them of all of the risks of the investment instead of glossing over such risks, 3) that their investment advisor and broker-dealer is aware and properly informs them of any SEC investigations into entities involved in the investment and the practice of that entity of comingling funds and using new investor money to pay previous investors, and 4) that their investment advisor and broker-dealer helps them enter only investments that are appropriate, suitable, safe, secure, and return a guaranteed return on investment if such is requested, and only properly certify as such.

214.    Plaintiff relied on these representations in making the decision to invest in DBSI LIDF notes, and he was induced to invest in these notes by these representations. Plaintiff's main concerns for the Trust investment was that it would be appropriate, suitable, safe, secure, and return a guaranteed return on investment. Each representation above misled Plaintiff into believing that the investment was appropriate, suitable, safe, secure, and would return a guaranteed return on investment, and because of that falsely created belief, Plaintiff decided to invest in DBSI LIDF notes. Had Plaintiff been aware of the falsity of the representations, particularly if he had been aware of the SEC complaint and comingling of funds or the fact that the Trust did not meet the investor requirements under the PPM, he would not have invested in the DBSI LIDF notes.

215.    Defendants were aware of the dangerous deficiencies in DBSI's practices and willfully chose to make false representations to Plaintiff concerning Plaintiff's investment in DBSI LIDF, or they made each representation recklessly, knowing that they had not done sufficient due diligence into DBSI's practices and the risk and inappropriateness of the investment for the Trust Plaintiff represented.

216.    The Defendants made each representation for the purpose of inducing Plaintiff to use Trust funds to make an investment in DBSI LIDF notes because each stood to gain compensation, either directly or indirectly, from the sale of the investment.

217.    The Defendants had a legal duty to Plaintiff to conduct proper investigation into the risks and appropriateness of the DBSI LIDF notes and inform Plaintiff of the same because Defendants were investment advisors, broker-dealers, and sellers of securities, and these representations, as already described, materially affect the desirability of the investment.

218.    As a direct result of the Defendants' fraudulent misrepresentations, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal investment of $180,000 and missed interest payments, with reasonable attorneys' fees and costs associated with this action.

Count VII – Negligent Misrepresentation

219.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

220.    More specifically, Plaintiff incorporates ¶¶ 113 and 114 herein. Each constitutes a representation of fact made by Defendants regarding the DBSI LIDF investment.

221.    As already explained under ¶¶ 113 and 114, each of these representations were false.

222.    Each of these representations regarded a presently existing fact. Each fact regarded the suitability, risk, and appropriateness of investing in DBSI LIDF notes, which suitability, risk, and appropriateness was known at the time the investment was offered to the Trust Plaintiff represented and at the time the Trust invested in the notes. Thus, each representation regarded a presently existing fact.

223.    Each of these representations regarded material facts. A reasonable investor of ordinary intelligence and prudence would think important in determining whether to buy a security, the following: 1) that all necessary documentation regarding the investment, such as page 58 of the PPM, is shown to the investor and is properly initialed by the investor and signed by the broker-dealer or other representative, especially when such signature by the broker-dealer or other representative substantiates compliance with state and federal securities laws and NASD 2810 and certifies that the investment was suitable and appropriate for the investor based on all the information that the broker-dealer or other representative had received from the investor, 2) that their investment advisor and broker-dealer is properly informed on the risks of any investments they recommend and that their advisor and broker-dealer properly inform them of all of the risks of the investment instead of glossing over such risks, 3) that their investment advisor and broker-dealer is aware and properly informs them of any SEC investigations into entities involved in the investment and the practice of that entity of comingling funds and using new investor money to pay previous investors, and 4) that their investment advisor and broker-dealer helps them enter only investments that are appropriate, suitable, safe, secure, and return a guaranteed return on investment if such is requested, and only properly certify as such.

224.    Plaintiff relied on these misstatements and omissions in making the decision to invest in DBSI LIDF notes. Plaintiff's main concerns for the Trust investment was that it would be appropriate, suitable, safe, secure, and return a guaranteed return on investment. Each misstatement and omission above misled Plaintiff into believing that the investment was appropriate, suitable, safe, secure, and would return a guaranteed return on investment, and because of that falsely created belief, Plaintiff decided to invest in DBSI LIDF notes. Had Plaintiff been aware of the foregoing misstatements and omissions, particularly if he had been

aware of the SEC complaint and comingling of funds or the fact that the Trust did not meet the investor requirements under the PPM, he would not have invested in the DBSI LIDF notes.

225.    Defendants carelessly or negligently made these false representations. Proper investigation and ordinary care would have revealed to Defendants and Plaintiff the falsity of Defendant's representations.

226.    Defendants expected Plaintiff to rely on these representations and act thereon. Plaintiff came to Defendants seeking investment advice and investments that fit the needs of the Trust he represented and were appropriate, suitable, safe, secure, and returned a guaranteed return on investment. Defendants made these representations to advise Plaintiff on what an appropriate, suitable, safe, secure, and appropriate investment would be that returned a guaranteed return on investment. Such investment advice is given for the purpose of informing a potential investor of his or her options and making a decision in reliance on such advice.

227.    Plaintiff reasonably relied on these representations. Defendants were sophisticated parties who were investment advisors, broker-dealers, and sellers of securities with knowledge of the risks and appropriateness of the DBSI LIDF notes for the Trust Plaintiff represented. Plaintiff was reasonable in relying on the investment advice of professional investment advisors and securities sellers.

228.    Because Defendants were investment advisors, broker-dealers, and sellers of securities, and because their representations to Plaintiff, as already described, materially affect the desirability of the investment, the Defendants had a legal duty to Plaintiff to do due diligence and conduct proper investigation into the risks, suitability, and appropriateness of the DBSI LIDF notes and inform Plaintiff of the same.

229.    As a direct result of the Defendants' negligent misrepresentations, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal investment of $180,000 and missed interest payments, with reasonable attorneys' fees and costs associated with this action.

Count VIII – Breach of Contract
**(Knox)**

230.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

231.    In February 2007, Plaintiff entered into a contract with Knox, whereby Knox would provide competent investment advice and receive a commission.

232.    Plaintiff provided Day with a payment between $5,000.00 and $7,500.00 to retain its services as its investment advisor.

233.    Knox promised that he would provide competent and reasonably prudent investment advice to Plaintiff.

234.    Defendant Knox breached his contract with Plaintiff by failing to provide competent and reasonably prudent investment advice in accordance with their agreement.

235.    Without limiting the generality of the foregoing, Day provided Plaintiff with poor or fraudulent investment advice regarding DBSI LIDF, constituting a breach of contract and resulting in substantial loss to Plaintiff, including but not limited to at least $180,000.00 lost in the DBSI LIDF scheme.

236.    Knox and/or via respondeat superior or agency, through its employees, servants, agents, or affiliates acting in the scope of their employment or agency, has breached its contractual duties as to Plaintiff.

237.    Plaintiff has been injured by Knox's breaches of contract in an amount to be proven at trial, but not less than $180,000.00 plus interest at 12% per annum from the date the first interest payment was not made.

238.    As a direct result of Knox's breach, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal investment, missed interest payments, and reasonable attorneys' fees and costs associated with this action.

**(Geneos)**

239.    Prior to investing in DBSI LIDF, Plaintiff was required to submit a "new account application" with Geneos. (See Exhibit D).

240.    This application was approved by Geneos, and Plaintiff was permitted to invest in DBSI LIDF.

241.    A contract was formed between the two parties.

242.    Geneos was to provide competent and reasonably prudent investment advice.

243.    Geneos failed to provide competent and reasonably prudent investment advice and has, therefore, breached its contract with Plaintiff.

244.    As a direct result of Knox's breach, Plaintiff has been damaged in an amount to be proven at trial but not less than an amount that includes the Plaintiff's principal investment of $180,000 and missed interest payments, and reasonable attorneys' fees and costs associated with this action.

Count IX – Breach of the Implied Covenant of Good Faith and Fair Dealing

245.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

246.    Pursuant to Utah law, each and every contract entered into in the state of Utah carries with it an implied covenant of good faith and fair dealing.

247.    The implied covenant of good faith and fair dealing imposes a burden upon the contracting parties to act in such a way as to ensure the other parties receive the fruits of the contract and that a party's actions are consistent with the agreed common purpose and the justified expectations of the contracting party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

248.    Knox and Geneos, through their employees, servants, agents, principals, and/or affiliates, breached this covenant because Plaintiff had informed them that Trust funds must be invested in safe and secure investments with a regular return, and Knox and Geneos failed to fully research the DBSI LIDF investment while representing that they had completed their due diligence requirements, and failed to assure that the Trust was an accredited investor.

249.    Knox and Geneos further failed to inform Plaintiff of DBSI's management policies, i.e. commingling of funds, complete disregard for the identity of the separate DBSI entities, and DBSI's continuous use of funds for purposes other than stated in its PPMs.

250.    In the alternative, Knox and Geneos were aware of the dangerous deficiencies in DBSI's practices and the failure of the Trust to qualify as an accredited investor, and breached the covenant of good faith and fair dealing by willfully choosing not to disclose to Plaintiff facts pertinent to Plaintiff's investment in DBSI LIDF.

251.    Thus the Defendant's actions and lack of action were not consistent with Plaintiff's clear and stated purposes, intentions, and expectations of the Trust fund investment.

252.     As a result of this breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages in an amount no less than its principal investment of $180,000.00 plus interest at 12% per annum, plus all legal fees incurred through this lawsuit.

COUNT X – NEGLIGENT SUPERVISION

253.     Plaintiff hereby incorporates and re-alleges all preceding paragraphs of this Complaint as though fully set forth herein.

254.     John Doe had a duty to supervise Day.

255.     Day encouraged Plaintiff to invest in DBSI LIDF, knowing due diligence had not been conducted on the investment.

256.     It was foreseeable that an unsupervised or negligently supervised investment advisor could give unsound and incorrect investment advice that would lead an investor to enter into an unsafe, unsecure, and inappropriate investment.

257.     John Doe's negligent supervision of Day permitted Day to give unsound advice to Plaintiff that was the direct and proximate result of the damages sustained by Plaintiff.

258.     As a result of John Doe's failure to supervise Day, Plaintiff has been damaged in an amount no less than its principal investment of $180,000.00 plus interest at 12% per annum, plus legal fees incurred through this lawsuit.

PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

1.     That Plaintiff be awarded judgment on each and every action contained herein in the amount requested or in the amount proven at trial;

2.     That pursuant to Utah Code Annotated §61-1-22(2), Plaintiff be awarded costs, interest, treble damages, and attorneys' fees for the fraudulent actions of the Defendants; and

3.      That pursuant to the applicable federal statutes, Plaintiff be awarded costs, interest, and attorneys' fees for the actions of the Defendants.

4.      That Plaintiff be awarded any other and further relief that the Court deems just and equitable.

SIGNED AND DATED this  _17_  day of August, 2011.

_____/s/ Patrick J. Ascione_____
PATRICK J. ASCIONE
MALISA WHITING
Attorneys for Plaintiff